# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 15, 2024     Decided September 9, 2025
Reissued September 24, 2025

No. 24-1001

IN RE: SEALED CASE

———

On Appeal from the United States Tax Court

———

*Jason D. Wright* argued the cause and filed the briefs for appellant.

*Brian C. Wille* and *Usman Mohammad* were on the brief for *amicus curiae* Whistleblower 11099-13W in support of appellant.

*Dean Zerbe* was on the brief for *amicus curiae* Zerbe, Miller, Fingeret, Frank & Jadav, LLP in support of appellant.

*Marie E. Wicks*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Bruce R. Ellisen*.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

GARCIA, *Circuit Judge*:  Appellant is a whistleblower who alerted the IRS that several prominent Wall Street firms were helping their clients avoid paying certain taxes.  The resulting IRS investigations recovered hundreds of millions of dollars in unpaid taxes.  By statute, Appellant was entitled to between 15% and 30% of the proceeds collected from each firm whose misconduct he helped expose.  The IRS Whistleblower Office issued him five such awards, tied to the IRS's recovery from each firm.  For four of those awards, the Office allotted him the maximum 30% recovery.  For one, however, it awarded Appellant only 22%, yielding him millions less than a 30% award would have.  The Office explained the reduction by claiming that, although the IRS personnel investigating similar misconduct by other firms owed their knowledge of these complex and novel tax violations to Appellant, the team investigating this particular firm had discovered those violations on its own.

Because we agree with Appellant that the Whistleblower Office's factual finding is not supported by the record, we vacate the Tax Court's decision affirming the award and remand for further proceedings.

# I

## A

The IRS relies on whistleblowers to help uncover tax evasion.  *See* 26 U.S.C. § 7623(a).  To incentivize disclosure, Section 7623(b)(1) of the Internal Revenue Code entitles whistleblowers to a share of any tax proceeds that their cooperation enables the government to recover.  If the IRS moves forward "with any administrative or judicial action . . . based on" a whistleblower's information, the whistleblower "shall . . . receive as an award at least 15 percent but not more than 30 percent of the proceeds collected."  *Id.* § 7623(b)(1). The  Whistleblower  Office,  a  division  within  the  IRS,

administers the award program. *See id.*; *see also* Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, Div. A, Title IV, § 406(b), 120 Stat. 2922, 2959–60.

To request an award, a whistleblower must submit an Application for Award for Original Information (or Form 211) to the Whistleblower Office. *See* 26 C.F.R. § 301.7623-1(c)(2). Form 211 asks the whistleblower to identify the taxpayer whose misconduct she helped uncover and describe "how the information on which the [award request] is based came to [her] attention." *Id.* For meritorious requests, Section 7623(b)(1) requires the Whistleblower Office to determine the size of the award—that is, where in the range of 15% to 30% of recovered proceeds the award should fall—by evaluating "the extent to which the individual substantially contributed to [the enforcement] action."

Once the award is finalized, a whistleblower can appeal to the Tax Court. *See* 26 U.S.C. § 7623(b)(4). A whistleblower who is still dissatisfied may then seek review from a United States Court of Appeals. *See id.* § 7482(a)(1).

**B**

Appellant worked for a large investment banking firm until 2005. During his time there, he discovered that the firm had been helping "offshore hedge funds to avoid paying taxes on dividends received from U.S. corporations." Suppl. App. 103. For example, the firm would hold stock for foreign clients and pay them the equivalent of the stock's total returns, bypassing a requirement to withhold tax on dividends that applies when offshore entities hold stock themselves.

Appellant soon learned that several other Wall Street firms were engaging in similar practices. Armed with that knowledge, he resigned from his post in June 2005, taking

hundreds (if not thousands) of pages of internal firm documents with him.

That same month, Appellant contacted the IRS and began meeting regularly with investigators. He educated them about how the transactions worked and identified which other firms were offering similar services. Between July 2005 and March 2006, at an IRS official's suggestion, he filed four Forms 211— one for each firm whose tax noncompliance he brought to investigators' attention. One of the forms concerned a taxpayer we will call "the Company."

Appellant's final meeting with investigators occurred in March 2006. Two months later, unbeknownst to Appellant, officials from across the IRS convened to discuss the information he had shared with them.

After hearing nothing from the IRS for several months, Appellant took his story to a reporter from *The Wall Street Journal*. In 2007, the reporter published two articles about offshore tax abuse based on Appellant's information. One of the articles mentioned the Company.

The reporting generated interest among members of the U.S. Senate Permanent Subcommittee on Investigations, which recruited Appellant to assist in an investigation into the dividend withholding issues. In September 2008, with Appellant's help, the Subcommittee held a public hearing and published a report with its findings. The report detailed misconduct by the firms that Appellant had identified in his Forms 211 from 2005 and 2006, as well as misconduct by several additional firms.

Appellant then filed a new batch of Forms 211 covering all firms mentioned in the Subcommittee's report. Included in his 2008 submission was a second Form 211 describing his role in calling attention to the Company's tax noncompliance.

By this point, an IRS field team had already opened an audit into the Company for the relevant tax years. In 2009, that team gained access to materials that Appellant had supplied the Subcommittee. The field team used those materials "to develop specific document requests and other inquiries," and the information it received in response enabled it to uncover the full extent of the Company's tax noncompliance. App. 36. In 2014, the IRS entered two closing agreements with the Company, requiring it to pay a total of $88 million. The IRS also recovered unpaid tax proceeds from several other firms that had engaged in similar practices.

Between 2014 and 2019, the Whistleblower Office issued Appellant five awards to recognize his contributions. For four of those awards, the Whistleblower Office awarded him 30% of the recovered tax proceeds, explaining that he was "responsible for the identification of the taxpayer[] [and] the [IRS's] understanding of the transaction[s]." App. 222; *see also* App. 202–03; App. 234; App. 241.

Things played out differently for Appellant's award request concerning the Company. In 2017, the analyst assigned to evaluate that request proposed allotting Appellant only 22% of the collected proceeds. The analyst's supervisor declined to approve the recommendation, instructing him to elaborate on his "reasons for using [a] different [percentage] . . . than was used in prior award recommendations on other claims." Suppl. App. 217.

The analyst then contacted the IRS field team for more specifics about what had prompted its audit into the Company and how it had used Appellant's information. We describe the details of that exchange below. *See infra* at 8–10. For now, it suffices to say that the analyst retained his 22% recommendation. He explained that, unlike "in the other cases," this field team "was already pursuing the withholding

issues against [the Company] prior to receiving the . . . whistleblower information." Suppl. App. 106 n.4. The Whistleblower Office approved the 22% recommendation.

Appellant sought the Tax Court's review. As relevant here, he argued that the record did not justify the inconsistency between the 22% award and the prior 30% awards. The Tax Court reviewed the Whistleblower Office's determination for abuse of discretion, rejected Appellant's challenge, and granted summary judgment to the government. *Whistleblower 8391-18W v. Comm'r of Internal Revenue*, 161 T.C. 58, 75 (2023).

This appeal followed.

## II

We review the Tax Court's grant of summary judgment to the government de novo. *See Byers v. Comm'r of Internal Revenue*, 740 F.3d 668, 675 (D.C. Cir. 2014). The parties, however, disagree on the underlying standard of review that the Tax Court—and, by extension, this court on appeal—should apply to the Whistleblower Office's award determinations. The government defends the Tax Court's abuse of discretion standard; Appellant argues that Section 7623 requires the Tax Court to review the Whistleblower Office's decisions de novo. We need not resolve that dispute. As explained below, the Whistleblower Office's award cannot survive even the more deferential abuse of discretion standard. *Cf. Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017).[1]

---

[1] Appellant supplements his standard-of-review argument by urging that the Whistleblower Office's resolution of his award request would violate the Appointments Clause unless the Tax Court's review is de novo. Appellant raises that issue only in service of his standard-of-review argument, and not as an independent

We therefore assume without deciding that the Whistleblower Office's award determinations are subject to abuse of discretion review. Under that standard, the Tax Court defers to the Whistleblower Office's factual findings unless they are "clearly erroneous." *Kasper v. Comm'r of Internal Revenue*, 150 T.C. 8, 23 (2018) (citation modified). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

**III**

The Whistleblower Office based the 22% award determination on its finding that this field team discovered the Company's withholding issues on its own. On this record, that finding was clearly erroneous.

Remember the context set out above: Appellant worked extensively to bring widespread and problematic practices to the IRS's attention. He met with the IRS repeatedly for almost a year in 2005 and 2006 and submitted Forms 211 in 2005, 2006, and 2008. He then worked with a journalist to make the withholding issues public knowledge in 2007 and contributed to the Senate Subcommittee investigation. The Whistleblower Office in turn awarded Appellant 30% of the proceeds recovered from four other firms engaged in similar practices—the maximum award available under Section 7623(b)(1). For one of those awards, the Whistleblower Office even stated explicitly that Appellant had "identified an issue or transaction of a type previously unknown to the IRS." App. 202.

---

constitutional challenge. We accordingly need not resolve it for the reasons above.

8

Now turn to the Office's sole justification for giving Appellant only a 22% award here: Unlike "in the other cases," the Office said, the field team auditing the Company "was already pursuing the withholding issues against [the Company] prior to receiving the . . . whistleblower information." Suppl. App. 106 n.4. It would have been quite an achievement for this field team to have uncovered these novel and complex transactions without Appellant's assistance, especially when no one else in the IRS had managed to do so. We would therefore expect some concrete, affirmative indication to support the Whistleblower Office's theory.

Indeed, the Whistleblower Office recognized the need for such an explanation. When the responsible analyst submitted his original award proposal, his supervisor declined to approve it because the proposal did not sufficiently explain why the analyst had recommended a lower percentage than in the prior awards. *See* Suppl. App. 217. The analyst then asked the field team for more details.

What the analyst heard back provided no discernible factual basis for the inconsistent treatment. The revised award memorandum rested primarily on a set of email exchanges between the analyst and the field team. The analyst began by asking the team whether it had "start[ed] the exam"—that is, the audit of the Company for the relevant tax years—"based on [Appellant's] pre-2008 submissions [or] contacts with the IRS about the withholding issues." Suppl. App. 227. The field team responded that it "did not start the exam based on [Appellant's] pre-2008 submissions [or] contacts with the IRS about the withholding issues." Suppl. App. 224. The analyst followed up: "If it wasn't the [Subcommittee]/whistleblower information that initiated the exams, then what was it?" Suppl. App. 219. The field team responded simply: "This was a

subsequent year examination." *Id.*[2]  The award summarized that exchange as follows:  "The field team has specifically stated [that Appellant's] pre-2008 contacts with the IRS regarding the . . . withholding issues was not the reason [it] began pursuing these issues."  Suppl. App. 107.

The field team said no such thing.  The field team stated that Appellant's information had not prompted its "exam," which other messages clarified was a "subsequent year examination" involving multiple matters unrelated to the transactions Appellant had identified.  Suppl. App. 219; Suppl. App. 224.  The field team's statements thus suggest at most that the IRS began auditing the company for the tax years at issue for a reason other than Appellant's information.  The analyst, however, never asked the field team how or why it started investigating the specific dividend tax withholding issues Appellant had exposed.  And the field team said nothing that would provide an answer.  The award improperly transmuted a statement that Appellant's information did not lead to the team's audit writ large into a far more specific claim that Appellant's information did not lead to the team's investigation of these exact withholding issues.[3]

---

[2] Curiously, neither party explains precisely what a "subsequent year examination" is.  The record suggests that the IRS initiates such an audit when it expects to find issues like those identified in an examination of prior tax years.  *See* Suppl. App. 254 n.8.

[3] In fact, the person responding on behalf of the field team was clear that he was not well-positioned to answer specific questions about events that occurred approximately a decade earlier.  The lead IRS examiner on the Company audit at issue had recently "retired."  Suppl. App. 219–20, 224.  Worse, the remaining employee lacked access to the "Case Activity Records" and other materials from the

The analyst's revised award memorandum also cited certain documents generated by the field team in 2008 as proof that the team had started examining the withholding issues before it had access to the Senate Subcommittee materials in early 2009. One document, for example, describes a teleconference in April 2008 "regarding the TRS issue," an apparent reference to one of the problematic schemes Appellant had identified. Suppl. App. 197. But by that point, Appellant had already met with IRS officials extensively and worked with a journalist who published two detailed articles about the tax practices at issue. Those 2008 records could perhaps be consistent with the analyst's theory that this field team discovered the Company's dividend withholding issues independently of Appellant's extensive contributions. But they are equally consistent with Appellant's contrary view that the field team became aware of those issues only because of his earlier efforts. The records do not speak to the key question of how this field team began investigating the specific practices Appellant identified.

At bottom, the record contains no indication that this field team discovered the Company's withholding issues on its own when the IRS officials who investigated other taxpayers' similar misconduct all owed their "understanding of the transaction[s]" to Appellant. App. 222; *see also* App. 202–03; App. 234; App. 241. Because the Whistleblower Office's award rested on the clearly erroneous factual finding that the team had done so, the award cannot stand.[4] We therefore need

---

relevant period because they "were kept by [the] retired employee." Suppl. App. 220.

[4] During oral argument, the government attempted to bolster the Whistleblower Office's reasoning by pointing to a timeline created by an IRS official in 2016 that summarizes Appellant's contacts with

not consider Appellant's remaining challenges to the Whistleblower Office's analysis.

**IV**

The Tax Court's grant of summary judgment to the government is vacated, and we remand this case for further proceedings consistent with this opinion.

*So ordered.*

---

investigators. The timeline states that, in 2009, "12 audit teams ha[d] access to the [Senate Subcommittee] documents[,] but none of the earlier [submissions by Appellant] were sent to the field." App. 186. The analyst did not reference the timeline in his revised award memorandum in 2017, the Tax Court did not rely on it, and the government's brief on appeal cites it only once—and in the brief's background section, no less. We therefore decline to consider it.